Sabita J. Soneji (CA Bar No. 224262)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
ssoneji@tzlegal.com

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JESSICA WHITE, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATERA, INC. and BAYLOR MIRACA GENETICS LABORATORIES, LLC d/b/a BAYLOR GENETICS,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

## I. INTRODUCTION

1. This case concerns Defendants' failure to protect some of the most sensitive information an individual can possess: genetic and medical information revealing a person's hereditary susceptibility to cancer.

2. Plaintiff Jessica White ("Plaintiff") underwent physician-ordered genetic testing because she was considered at heightened risk for breast cancer. Her healthcare provider ordered the Empower™ Hereditary Cancer Test, a genetic test offered and marketed by Defendant Natera, Inc. ("Natera") that examines an individual's DNA for genetic changes associated with hereditary cancers and is used to assess cancer risk and inform medical decisions. Natera markets Empower as a hereditary-cancer genetic test that screens for genes associated with increased cancer risk and can

inform treatment decisions.[1]

3. In connection with that physician-ordered testing, Plaintiff was directed to Natera and required to establish a Natera patient account. Natera assigned Plaintiff Case/Kit No. 16529873 and maintained the patient portal through which Plaintiff tracked her test and obtained her results. Plaintiff communicated directly with Natera concerning her testing and entrusted Natera with her identifying information, medical information, and extraordinarily sensitive genetic information.

4. Plaintiff did not select Defendant Baylor Genetics Laboratories, LLC ("Baylor Genetics") to perform genetic testing. Indeed, before receiving the data-breach notice at issue in this case, Plaintiff had never heard of Baylor Genetics. She did not knowingly establish an account or other relationship with Baylor Genetics and did not know that Baylor Genetics possessed, processed, maintained, or otherwise had access to information concerning her genetic testing.

5. But Baylor Genetics' possession of Plaintiff's genetic and medical information was no coincidence. Natera's own marketing materials have described Empower as having been "DEVELOPED IN PARTNERSHIP WITH BAYLOR GENETICS."[2] Published research likewise describes hereditary-cancer genetic testing using "Empower™, Natera, Inc. in collaboration with Baylor Genetics."[3]

6. Thus, while Natera presented Empower to patients and healthcare providers as its hereditary-cancer screening test, Baylor Genetics participated behind the scenes in the genetic-testing program through which Plaintiff entrusted her genetic and medical information to Natera. The precise manner in which Defendants shared, processed, transmitted, stored, and retained Plaintiff's

---

[1] Natera, *Empower™ Hereditary Cancer Test*, https://www.natera.com/oncology/empower-hereditary-cancer-test/ (last visited Aug. 26, 2026).

[2] Natera, *Empower™ Provider Brochure*, at 5 (2020) ("DEVELOPED IN PARTNERSHIP WITH BAYLOR GENETICS").

[3] Youbao Sha et al., *Refining the Interpretation of Variants of Uncertain Significance in Hereditary Cancer Screening Through Integrated RNA Sequencing*, 3 Genetics in Medicine Open 101914 (2025), ("Empower, Natera, Inc in collaboration with Baylor Genetics") https://pmc.ncbi.nlm.nih.gov/articles/PMC11788803/ (last visited Aug. 26, 2026).

information is known to Defendants and will be established through discovery.

7. In June 2026, the consequences of this arrangement became apparent to Plaintiff in the worst possible way. On or about June 15, 2026, Baylor Genetics discovered suspicious activity within its information-technology environment. Its subsequent investigation determined that an unauthorized third party had accessed portions of Baylor Genetics' network—and data stored on that network—from approximately June 11 through June 17, 2026 (the "Data Breach").

8. Baylor Genetics subsequently determined that the patient information potentially involved in the Data Breach included names, dates of birth, medical testing information, laboratory test results, health-insurance information, and, for a subset of patients, Social Security numbers. Baylor Genetics completed its review of the compromised information on or about July 30, 2026 and thereafter began notifying affected individuals.

9. One of those individuals was Plaintiff. Despite Plaintiff never having heard of Baylor Genetics or knowingly entrusting Baylor Genetics with her information, Baylor Genetics sent Plaintiff a notice concerning the Data Breach. The notice revealed for the first time that Baylor Genetics possessed information concerning Plaintiff sufficient to identify her as an individual potentially affected by the compromise of Baylor Genetics' patient information.

10. The nature of the information Defendants collected and maintained makes their security failures particularly consequential. Empower is not an ordinary laboratory test. It analyzes DNA for genetic changes associated with hereditary cancer and can reveal information concerning an individual's susceptibility to breast, ovarian, pancreatic, colorectal, and other cancers. Natera's own Empower materials explain that genetic-test results may be combined with personal and family cancer history to assess a patient's lifetime breast-cancer risk.

11. The information entrusted to Defendants therefore has consequences extending far beyond ordinary identifying information. Genetic information is immutable. Unlike a password or account number, an individual's genetic code cannot be cancelled or replaced after it has been exposed.

And hereditary genetic information can reveal sensitive information not only about the individual tested, but also about biological family members who share portions of that genetic inheritance.

12. Defendants knew or should have known the extraordinary sensitivity and value of the information entrusted to them. Natera operates a commercial genetic-testing business and reported that it processes tests in CLIA-certified laboratories in California and Texas.[4] Baylor Genetics likewise provides genetic-testing services and acknowledges that protecting the confidentiality, privacy, and security of information entrusted to it is a "fundamental responsibility."[5]

13. Defendants accordingly had a duty to implement and maintain reasonable administrative, technical, and physical safeguards commensurate with the sensitivity of the genetic, medical, and personally identifiable information they collected, received, processed, transmitted, and retained; to appropriately oversee the transmission and storage of that information within their genetic-testing enterprise; and to protect that information against unauthorized access and disclosure.

14. Defendants failed to fulfill those duties. An unauthorized third party was able to access Baylor Genetics' network and data stored there for approximately a week. Only after the Data Breach did Baylor Genetics report that it had enhanced monitoring and security controls, strengthened identity and access management, and implemented additional safeguards to protect sensitive information.

15. Plaintiff did not knowingly assume the risk that genetic and medical information entrusted to Natera for physician-ordered cancer-risk testing would be maintained by another genetic-testing company she had never heard of and subsequently exposed through inadequate data-security practices. Nor could Plaintiff reasonably protect herself against such an occurrence: Defendants controlled the systems, relationships, security practices, and data-retention decisions through which

---

[4] Natera, *Licenses*, https://www.natera.com/natera-licenses/ (listing CLIA certificates for Natera's laboratories in San Carlos, California and Austin, Texas) (last visited Aug. 26, 2026).

[5] Baylor Genetics, *Security Update*, https://www.baylorgenetics.com/securityupdate/ (last visited Aug. 26, 2026)

her information was collected, transmitted, maintained, and ultimately exposed.

16. Plaintiff brings this action individually and on behalf of all others similarly situated to obtain redress for Defendants' failure to safeguard the highly sensitive genetic, medical, and personally identifiable information entrusted to them, and for the resulting loss of privacy and confidentiality, loss of control over that information, increased risk of misuse, and other injuries caused by Defendants' conduct.

## II. PARTIES

17. Plaintiff Jessica White is a natural person and citizen of the State of Texas. Plaintiff resides in Beaumont, Texas.

18. Plaintiff underwent physician-ordered hereditary-cancer genetic testing because she was considered at heightened risk for breast cancer. Her healthcare provider, Karen Lazard of UTMB Regional Women's Services and Pediatrics, ordered Natera's Empower hereditary-cancer test on Plaintiff's behalf.

19. In connection with that testing, Plaintiff established an account with Natera and was assigned Natera Case/Kit No. 16529873. Plaintiff thereafter interacted directly with Natera concerning her testing, including through Natera's patient portal.

20. Plaintiff entrusted Natera with highly sensitive information concerning her identity, health, family and medical history, and genetic testing for the limited purpose of obtaining physician-ordered hereditary-cancer testing and related healthcare services.

21. At no time before receiving Baylor Genetics' Data Breach notice had Plaintiff heard of Baylor Genetics. Plaintiff did not select Baylor Genetics, knowingly establish a relationship with Baylor Genetics, or knowingly provide her genetic, medical, or personally identifiable information directly to Baylor Genetics.

22. Defendant Natera, Inc. ("Natera") is a Delaware corporation with its principal executive offices located in Austin, Texas. Natera is a molecular genetic-testing company that develops and commercializes testing services in oncology, women's health, and organ health. Among those products is Empower, which Natera describes as its hereditary-cancer screening test.

23. Although Natera presently maintains its principal executive offices in Texas, Natera

maintains substantial and longstanding operations in California. Natera operates a CLIA-certified and CAP-accredited clinical laboratory in San Carlos, California and currently occupies approximately 136,000 square feet of laboratory and office space at 201 Industrial Road in San Carlos. Natera has extended its lease for that facility through October 2032 and, in 2025, leased additional premises in San Carlos. Natera also maintains facilities in South San Francisco and Pleasanton, California.

24. Natera conducts significant portions of its genetic-testing business through its California operations. Natera has represented that it processes genetic tests in its CLIA-certified laboratories, including its San Carlos laboratory, and that its San Carlos facility is subject to California clinical-laboratory licensing and regulatory requirements.

25. Natera's relationship to California is particularly significant to the conduct alleged here. Natera's Empower materials provided to patients during the relevant period identified 201 Industrial Road, Suite 410, San Carlos, California as Natera's address, including on exemplar Empower hereditary-cancer test reports. Natera also directed patients with questions about their Empower reports to Natera personnel and made Empower results available through Natera's patient portal.

26. Defendant Baylor Miraca Genetics Laboratories, LLC d/b/a Baylor Genetics ("Baylor Genetics") is a Texas limited liability company with its principal place of business in Houston, Texas. Baylor Genetics provides clinical genetic-testing and related laboratory services. Its principal address is 2450 Holcombe Boulevard, Suite 2210, Houston, Texas 77021.

27. Baylor Genetics and Natera have maintained a commercial relationship involving genetic-testing services. Natera publicly marketed its Empower hereditary-cancer testing as having been developed in partnership with Baylor Genetics, and published research has described Empower testing as Natera testing conducted "in collaboration with Baylor Genetics." The precise nature, duration, and scope of Defendants' relationship during the relevant period—including their respective roles in receiving, processing, testing, transmitting, storing, securing, and retaining Plaintiff's genetic and medical information—are matters within Defendants' possession and will be established through discovery.

28. At all relevant times, each Defendant acted through its officers, employees, agents, contractors, business associates, laboratories, service providers, and other representatives acting within

the course and scope of their authority.

29. Plaintiff alleges that Defendants participated in, authorized, directed, controlled, or ratified the acts and omissions alleged herein, and that each Defendant was responsible for safeguarding the highly sensitive genetic, medical, and personally identifiable information entrusted to it and/or maintained within the genetic-testing enterprise through which Plaintiff's information came into Defendants' possession.

## III. JURISDICTION AND VENUE

30. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because this action is brought as a class action on behalf of more than 100 proposed Class members; at least one proposed Class member is a citizen of a state different from at least one Defendant; and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

31. This Court has personal jurisdiction over Natera because Natera has purposefully established substantial, continuous, and systematic business operations in California and, more particularly, within this District. Natera operates a substantial clinical genetic-testing laboratory and office facility in San Carlos, California, where it occupies approximately 136,000 square feet and has committed to maintaining that facility through at least 2032. Natera also maintains other laboratory, research, and office operations in California.

32. Natera's California contacts are directly related to its genetic-testing business and the type of conduct at issue in this action. Natera operates its San Carlos facility as a CLIA-certified clinical laboratory; performs molecular genetic-testing activities through its California operations; and used its San Carlos address in materials concerning the Empower hereditary-cancer testing program through which Plaintiff entrusted Natera with her genetic and medical information.

33. Natera has therefore purposefully availed itself of the privilege of conducting the genetic-testing business at issue in this action in California and within this District and could reasonably anticipate being haled into court here concerning claims arising from that business.

34. Baylor Genetics purposefully participated in a continuing commercial relationship with Natera involving Natera-branded genetic-testing products, including Empower. Plaintiff's own

Empower laboratory report establishes that the pre-analytic phase of her test was performed by Natera at its San Carlos, California laboratory and that Baylor Genetics performed Plaintiff's test at its Houston laboratory. Plaintiff's claims arise directly from that genetic-testing relationship and Baylor Genetics' receipt and maintenance of Plaintiff's information through it. The additional details concerning Baylor Genetics' communications with Natera's California operations, the location and administration of the parties' relationship, and the transmission of patient information between Defendants are within Defendants' possession and control and will be established through discovery.

35. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District. Plaintiff's Empower laboratory report establishes that the pre-analytic phase of her genetic test was performed by Natera at its San Carlos, California laboratory. Plaintiff's claims against Natera concern, among other things, Natera's collection and handling of patient information through that genetic-testing business and its provision of Plaintiff's information to Baylor Genetics in connection with her genetic testing.

36. Venue is also proper under 28 U.S.C. § 1391(b)(1) and (c) because Natera is subject to personal jurisdiction in this District with respect to this action and therefore resides in this District for venue purposes.

## IV. FACTUAL ALLEGATIONS

### A. Natera's Empower Hereditary Cancer Testing Business

37. Natera is a genetic-testing company that develops and commercializes molecular tests in oncology, women's health, and organ health. One of Natera's principal oncology offerings is the Empower™ Hereditary Cancer Test ("Empower"), which Natera markets to healthcare providers and patients as a means of identifying inherited genetic variants associated with an increased risk of cancer.

38. Natera describes Empower as a test that "looks for specific genetic changes in your DNA" that may help explain a patient's personal or family history of cancer.[6] Natera further represents that this information, together with the patient's personal cancer history, may be used by healthcare

[6] See supra note 1.

providers to guide treatment decisions.[7]

39. Empower is thus not an ordinary consumer product or generalized health-and-wellness service. It is physician-ordered medical genetic testing intended to generate information concerning a patient's hereditary susceptibility to serious diseases, including breast cancer, and to inform decisions concerning medical screening, prevention, and treatment.[8]

40. Depending upon the panel ordered, Empower analyzes dozens of genes associated with hereditary cancer syndromes. Natera's Empower materials identify genes including BRCA1, BRCA2, ATM, CHEK2, PALB2, TP53, PTEN, CDH1, and numerous others associated with hereditary cancer risk.

41. The information generated through Empower can reveal whether a patient carries a pathogenic or likely pathogenic genetic variant associated with increased cancer risk. Natera explains, for example, that a positive result means a genetic change associated with an increased risk of cancer was detected in the patient's blood and may indicate an increased risk of developing additional cancers during the patient's lifetime.

42. Empower testing also can generate or incorporate extensive information beyond the patient's genetic sequence and identified variants. Natera's exemplar Empower reports contain or contemplate the patient's name, date of birth, sex, ethnicity, medical-record information, collection-kit number, case-file number, ordering physician, clinic, sample type, collection and receipt dates, genetic-test results, and clinical interpretation.

43. For certain patients, Natera also performs a Tyrer-Cuzick breast-cancer risk assessment in connection with Empower. That assessment estimates a woman's five-year and lifetime risk of developing breast cancer based upon genetic testing together with highly personal clinical and family-history information.

44. The information used for that assessment may include a patient's personal health information and the cancer histories of her daughters, siblings, half-sisters, parents, aunts, female

---

[7] *Id.*
[8] *Id.*

cousins, and grandmothers on both the maternal and paternal sides of her family.

45. Accordingly, the Private Information collected, generated, processed, and maintained in connection with Empower can reveal not merely that an individual received medical care, but intimate and immutable facts concerning the individual's DNA, hereditary disease susceptibility, personal medical history, and the medical histories and genetic characteristics of biological relatives.

46. Natera controls the patient-facing aspects of the Empower testing process. Natera provides patients access to test information and results through the Natera Patient Portal, instructing patients that their results can be accessed at Natera's portal once available.[9]

47. Natera likewise provides genetic-counseling resources to patients concerning their Empower results. Its materials instruct patients who have questions about hereditary-cancer results that Natera's board-certified genetic counselors are available for consultations.[10]

48. Through this structure, patients reasonably understand that they are obtaining genetic-testing services from Natera. Natera brands the test as Empower, operates the patient portal, communicates with patients concerning their testing, provides access to their results, and offers Natera genetic counselors to discuss those results.

**B. Natera's Partnership With Baylor Genetics**

49. What Natera's patients may not know is that Natera has relied upon Baylor Genetics in connection with genetic-testing products marketed to patients under Natera's brand.

50. Natera and Baylor Genetics have maintained a commercial relationship concerning genetic-testing services. Publicly available materials establish that the companies collaborated in connection with genetic-testing products marketed by Natera, including hereditary-cancer testing. The precise contractual terms governing Defendants' relationship, including their respective responsibilities concerning the receipt, processing, analysis, storage, retention, and security of patient information, are within Defendants' possession and control and will be established through discovery.

---

[9] Natera, *Empower FAQ*, https://www.natera.com/oncology/empower-hereditary-cancer-test/faq/ ("Access your patient portal anytime through my.natera.com to track and view your results.") (last visited Aug. 26, 2026).

[10] *Id.*

51. The relationship extended specifically to Natera's hereditary-cancer testing business. Natera marketing materials described Empower as having been: "DEVELOPED IN PARTNERSHIP WITH BAYLOR GENETICS."

52. Published scientific literature similarly identifies the hereditary-cancer testing platform as "Empower™, Natera, Inc. in collaboration with Baylor Genetics." The collaboration therefore concerned the very Natera genetic-testing product Plaintiff received.

53. This arrangement permitted Natera to present Empower to physicians and patients as a Natera genetic-testing product while utilizing Baylor Genetics' genetic-testing expertise and laboratory capabilities in connection with the underlying testing program.

54. Natera's own Empower materials reinforce that a laboratory distinct from the patient-facing Natera relationship may perform the underlying test. Natera states: "Empower™ has been developed and its performance characteristics determined by the CLIA-certified laboratory performing the test." Natera's patient guide does not identify that laboratory by name.

55. Thus, patients interacting with Natera's branded testing platform could provide extraordinarily sensitive genetic and medical information to Natera without necessarily knowing that another entity would receive, process, analyze, or retain that information in connection with the testing.

56. That is what occurred with Plaintiff. Plaintiff's healthcare provider ordered Natera's Empower test. Plaintiff dealt with Natera, established a Natera account, received a Natera case/kit number, communicated with Natera concerning her results, and accessed the testing process through Natera's patient portal.

57. Plaintiff had never heard of Baylor Genetics. She did not choose Baylor Genetics to perform laboratory services, did not establish an account with Baylor Genetics, and did not knowingly provide Baylor Genetics with her genetic or medical information.

58. Nevertheless, Baylor Genetics obtained and maintained information concerning Plaintiff. Plaintiff learned this only after Baylor Genetics experienced the Data Breach and sent Plaintiff an individualized notice concerning the incident.

59. Plaintiff's Empower laboratory report confirms Baylor Genetics' direct involvement

in her testing. The report states that the pre-analytic phase of Plaintiff's test was performed by Natera at its San Carlos, California laboratory; that Plaintiff's test was performed by Baylor Miraca Genetics, d/b/a Baylor Genetics, at its Houston laboratory; and that the post-analytic phase was performed by NSTX, Inc. in Austin, Texas. The report further states that the performance characteristics of Plaintiff's test were developed by Baylor Genetics.

60. Thus, Baylor Genetics obtained, processed, and maintained Plaintiff's Private Information in connection with the Natera Empower test ordered for Plaintiff.

61. The precise mechanisms by which Plaintiff's genetic, medical, and identifying information moved between Natera and Baylor Genetics—including which Defendant collected particular data elements, which systems received her information, which Defendant retained copies of that information, how long the information was retained, and what security requirements governed Defendants' handling of it—are matters peculiarly within Defendants' knowledge and control.

62. Defendants nevertheless knew that their commercial arrangement required the collection, transmission, processing, and/or retention of exceptionally sensitive genetic and medical information and therefore required security safeguards commensurate with the nature of that information.

**C. Defendants Collected and Maintained Highly Sensitive Private Information**

63. As a condition of providing genetic-testing services, Defendants collected, received, generated, processed, and/or maintained extensive personally identifiable information and protected health information concerning Plaintiff and Class members ("Private Information").

64. Private Information includes, without limitation and as applicable to each individual, names, dates of birth, contact information, medical-testing information, laboratory-test results, genetic-testing information, genetic variants, cancer-risk information, personal and family medical histories, health-insurance information, and other information concerning patients' identities and healthcare.

65. In connection with Empower specifically, the Private Information potentially includes information concerning a patient's hereditary predisposition to cancer and identifiable genetic variants associated with diseases including breast, ovarian, pancreatic, prostate, colorectal, and other cancers.

66. Unlike many other categories of compromised information, genetic information is immutable. A person whose password or payment-card number is compromised can replace it. A person cannot replace her DNA or change the hereditary characteristics encoded within it.

67. Genetic information is also inherently familial. Information revealed by testing one individual can disclose information concerning the genetic characteristics and potential disease susceptibility of that individual's biological relatives, including relatives who never submitted to genetic testing themselves.

68. Defendants therefore knew or should have known that unauthorized access to the information maintained in connection with their genetic-testing operations could inflict uniquely serious and lasting privacy harms.

69. Defendants also knew that patients such as Plaintiff provided their Private Information for the limited purpose of obtaining medical genetic-testing services and reasonably expected Defendants to safeguard that information from unauthorized access and disclosure.

70. By obtaining, using, and retaining Plaintiff's and Class members' Private Information in connection with their commercial genetic-testing businesses, Defendants assumed and owed duties to employ reasonable and appropriate safeguards to protect that information.

**D. The Data Breach**

71. On or about June 15, 2026, Baylor Genetics detected suspicious activity within its information-technology environment.[11] Baylor Genetics thereafter initiated an investigation, engaged third-party cybersecurity specialists, and notified law enforcement.

72. According to Baylor Genetics, its investigation determined that an unauthorized third party gained access to portions of Baylor Genetics' network and to data stored within that network between approximately June 11 and June 17, 2026 (the "Data Breach").

73. The unauthorized third party therefore had access to Baylor Genetics' systems and the sensitive patient information maintained within them for approximately one week before Baylor Genetics contained the intrusion.

[11] *See supra* note 5.

74. Baylor Genetics thereafter undertook a review to determine what information had been present in the affected systems and to whom that information related. Baylor Genetics did not complete that process until approximately July 30, 2026, more than six weeks after it first detected the suspicious activity.

75. Baylor Genetics determined that the patient information potentially involved in the Data Breach varied by individual but could include names, dates of birth, medical testing information, laboratory test results, health-insurance information, and, for a subset of affected individuals, Social Security numbers.[12]

76. These categories are particularly significant in the context of Baylor Genetics' business. Baylor Genetics is not a general healthcare provider maintaining routine administrative records. It is a clinical genetics laboratory whose business involves testing and information concerning patients' genetic characteristics, hereditary disease risks, and related medical conditions.

77. Nor was the information Baylor Genetics maintained concerning Plaintiff incidental to an ordinary healthcare encounter. As alleged above, Plaintiff underwent Natera's Empower hereditary-cancer testing because her healthcare provider considered her at heightened risk for breast cancer. Empower examines genetic changes in a patient's DNA that may bear upon hereditary cancer risk and medical decision-making.

78. Baylor Genetics subsequently sent Plaintiff notice concerning the Data Breach. Until receiving that notice, Plaintiff did not know Baylor Genetics possessed information concerning her at all.

79. Baylor Genetics' notice thus revealed two troubling facts to Plaintiff at once: first, that a company with which she had never knowingly established a relationship possessed information concerning her; and second, that an unauthorized third party had gained access to that company's network and data.

80. Plaintiff alleges, on information and belief, that the Private Information maintained by Baylor Genetics concerning Plaintiff originated from and/or was maintained in connection with

---

[12] *See supra* note 5.

Plaintiff's physician-ordered Natera Empower genetic testing and Defendants' genetic-testing relationship.

81. The precise information concerning Plaintiff that was accessed, acquired, viewed, copied, exfiltrated, and/or otherwise compromised during the Data Breach is presently within Defendants' exclusive possession and control.

82. Baylor Genetics' public notice does not disclose, among other things, the identity of the threat actor; the particular vulnerability or security deficiency exploited; the systems initially compromised; the extent to which information was exfiltrated rather than merely accessed; the particular databases, files, or repositories accessed; whether Plaintiff's genetic-testing results or underlying genetic data were among those repositories; or why the unauthorized actor was able to remain within Baylor Genetics' environment for approximately one week.

83. Nor has Natera explained to Plaintiff why Baylor Genetics possessed information concerning her Natera Empower testing, what information Natera provided or made available to Baylor Genetics, what contractual or technical safeguards Natera required Baylor Genetics to employ, whether Natera audited or otherwise monitored Baylor Genetics' security practices, or whether Natera retained responsibility for protecting Plaintiff's information while that information was in Baylor Genetics' possession.

84. Defendants possessed these facts and were in a far better position than Plaintiff to understand the scope and consequences of the Data Breach. Plaintiff and Class members were forced to rely upon Defendants to accurately investigate the incident, identify the information affected, disclose the risks created by the compromise, and take appropriate measures to protect them.

85. Following the Data Breach, Baylor Genetics stated that it had taken additional steps to strengthen its security environment, including enhanced monitoring and security controls, strengthened identity and access management, and additional safeguards designed to protect sensitive information.

86. The implementation of these measures only after the Data Breach raises the reasonable inference that additional or stronger safeguards were available before the Data Breach but had not been adequately implemented.

87. Had Defendants employed reasonable security measures appropriate to the sensitivity of the genetic and medical information entrusted to them—including appropriate access controls, authentication measures, network monitoring, segmentation, endpoint protection, vulnerability management, intrusion detection, data minimization, encryption, and other generally accepted safeguards—the Data Breach could have been prevented or its scope substantially reduced.

**E. Healthcare and Genetic Information Are Prime Targets for Cybercriminals**

88. The Data Breach was not an unforeseeable event. Long before June 2026, healthcare entities and genetic-testing companies knew that they were prime targets for cybercriminals because they collect and retain large quantities of valuable and highly sensitive personal and medical information.

89. Healthcare information is particularly attractive to criminals because a single medical record may combine numerous categories of information useful for fraud and identity theft, including names, dates of birth, addresses, insurance information, medical identifiers, and other personally identifiable information.

90. Unlike payment-card information, which can generally be cancelled and replaced following a compromise, medical and genetic information cannot readily be changed. Once disclosed, an individual may have no practical means of preventing continued possession, dissemination, aggregation, or misuse of that information.

91. Genetic-testing companies face an even more acute security obligation. Their business necessarily involves information capable of revealing immutable biological characteristics, hereditary disease susceptibility, familial relationships, and deeply personal information concerning an individual's present and future health.

92. Natera plainly understood this. Empower is specifically designed to identify inherited genetic variants associated with hereditary cancer and to provide information that healthcare providers may use in screening, prevention, and treatment decisions.

93. Natera's own materials demonstrate the breadth and sensitivity of the information involved. An Empower report can contain a patient's genetic variants, cancer-risk information, ordering healthcare provider, sample information, clinical history, and detailed family cancer history.

94. Natera further recognizes that hereditary-cancer testing has implications extending beyond the individual tested. Its materials expressly encourage patients who receive positive genetic results to discuss those results with family members because inherited genetic changes may bear upon relatives' health and need for genetic testing.

95. Defendants therefore knew or should have known that a security incident affecting their genetic-testing systems could compromise information of exceptional sensitivity and could affect not only the privacy interests of individual patients but also reveal information concerning their biological relatives.

96. Defendants also knew or should have known that healthcare cybersecurity threats were persistent, widespread, and increasing, and that reasonable security required measures designed not merely to prevent an initial intrusion but also to promptly detect, contain, and eradicate unauthorized access.

97. Despite that knowledge, an unauthorized third party was able to obtain access to Baylor Genetics' network and the data stored within it over a period spanning approximately June 11 through June 17, 2026.

**F. HIPAA and Federal Healthcare Data-Security Requirements**

98. Because Defendants collected, received, maintained, transmitted, and/or processed individually identifiable health information in connection with clinical genetic testing, they were required to treat that information with security safeguards appropriate to its highly sensitive nature.

99. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations establish national standards for protecting the privacy and security of protected health information ("PHI"). Although HIPAA does not itself provide Plaintiff with a private cause of action, its requirements are relevant to the standard of care applicable to entities entrusted with PHI.

100. The HIPAA Security Rule requires covered entities and business associates, as applicable, to protect electronic PHI against reasonably anticipated threats or hazards to its security or integrity and against reasonably anticipated uses or disclosures not permitted by law.

101. Among other things, HIPAA's Security Rule requires regulated entities to maintain

appropriate administrative, physical, and technical safeguards; conduct accurate and thorough assessments of potential risks and vulnerabilities to electronic PHI; implement security measures sufficient to reduce identified risks and vulnerabilities to a reasonable and appropriate level; and regularly review information-system activity.

102. HIPAA's security requirements further contemplate appropriate access controls, authentication procedures, security-incident procedures, contingency planning, workforce security, and mechanisms to protect electronic PHI from improper alteration, destruction, access, or transmission.

103. These requirements are particularly salient here because Defendants' genetic-testing operations necessarily involved electronic transmission and storage of exceptionally sensitive PHI between healthcare providers, Natera, laboratories, patients, and other participants in the testing process.

104. Plaintiff's Empower testing involved information used for healthcare purposes, including information derived from Plaintiff's DNA and information potentially bearing upon her hereditary susceptibility to breast and other cancers. Natera itself explains that Empower results may be used by healthcare providers to guide treatment decisions.

105. Defendants knew or should have known that compliance with reasonable healthcare data-security standards required security measures commensurate with these risks and with the sensitivity of the information maintained in their systems.

106. To the extent Natera entrusted Plaintiff's PHI to Baylor Genetics to perform laboratory or other services on Natera's behalf, Natera remained obligated to exercise reasonable care in selecting, contracting with, transmitting information to, and overseeing entities to which it entrusted patient information.

107. Likewise, to the extent Baylor Genetics received Plaintiff's PHI as a covered entity, business associate, subcontractor, laboratory service provider, or other participant in Defendants' genetic-testing relationship, Baylor Genetics was obligated to safeguard that information against unauthorized access and disclosure.

108. Defendants' respective HIPAA statuses, the existence and terms of any business-

associate agreement or other data-security provisions between them, and the allocation of responsibility for safeguarding Plaintiff's information are matters within Defendants' possession and control and will be established through discovery.

**G. Defendants Failed to Comply with FTC Data-Security Guidance**

109. The Federal Trade Commission ("FTC") has long recognized that businesses collecting and maintaining sensitive consumer information must implement reasonable and appropriate measures to protect that information from unauthorized access.

110. The FTC has further concluded that a company's failure to maintain reasonable and appropriate security for consumers' sensitive personal information may constitute an unfair practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. See, e.g., *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

111. Critically here, the FTC has also instructed businesses that entrust sensitive information to third-party service providers to exercise appropriate oversight and verify that those providers have implemented reasonable security measures.[13]

112. That principle applies with particular force to Natera. Natera collected Plaintiff's Private Information through a physician-ordered, Natera-branded hereditary-cancer testing service and, on information and belief, disclosed, transmitted, made available, and/or caused that information to be provided to Baylor Genetics as part of Defendants' genetic-testing relationship.

113. Natera therefore had a duty to exercise reasonable care not only in securing the systems and information directly under its control, but also in selecting and overseeing entities to which it entrusted patients' genetic and medical information and in requiring those entities to maintain safeguards commensurate with the extraordinary sensitivity of that information.

114. Baylor Genetics, in turn, had a duty to implement reasonable and appropriate security measures to protect the Private Information it received and maintained in connection with the genetic-testing services it provided.

---

[13] Federal Trade Commission, *Start with Security: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/start-security-guide-business? (advising businesses to select service providers capable of implementing appropriate security measures, incorporate appropriate security standards into contracts, and monitor providers' compliance) (last visited Aug. 26, 2026).

115. Defendants knew or should have known of these established data-security principles and of the need to implement safeguards appropriate to the exceptionally sensitive genetic, medical, and personally identifiable information maintained in connection with their businesses.

116. The Data Breach demonstrates that reasonable and appropriate safeguards were not in place and/or were not adequately implemented. An unauthorized third party was able to gain access to Baylor Genetics' network and data and maintain that access over a period of approximately one week.

117. Defendants' failure to adequately protect Plaintiff's and Class members' Private Information, including through reasonable security controls and appropriate oversight of the entities participating in their genetic-testing operations, was inconsistent with the reasonable data-security practices long identified by the FTC.

**H. Defendants Failed to Comply with Industry-Standard Cybersecurity Practices**

118. Defendants' security obligations were also informed by widely recognized cybersecurity standards and frameworks applicable to organizations that maintain sensitive personal and health information.

119. The National Institute of Standards and Technology ("NIST") Cybersecurity Framework and the Center for Internet Security ("CIS") Critical Security Controls identify generally accepted cybersecurity practices designed to reduce the likelihood and consequences of unauthorized access to sensitive information.[14]

120. These frameworks emphasize, among other things, identifying and managing cybersecurity risks; controlling and authenticating access to systems and sensitive data; protecting stored and transmitted information; securely configuring and maintaining systems; monitoring networks for anomalous and unauthorized activity; identifying and remediating vulnerabilities; promptly detecting security incidents; and maintaining effective incident-response capabilities.

121. These standards were particularly relevant to Defendants because their businesses

[14] National Institute of Standards and Technology, *The NIST Cybersecurity Framework (CSF) 2.0*, NIST CSWP 29 (Feb. 26, 2024), https://www.nist.gov/publications/nist-cybersecurity-framework-csf-20 (last visited Aug. 26, 2026); Center for Internet Security, *CIS Critical Security Controls v8.1*, https://www.cisecurity.org/controls/v8-1 (last visited Aug. 26, 2026).

required them to collect and maintain information concerning patients' identities, medical histories, genetic characteristics, hereditary disease risks, and laboratory testing.

122. Reasonable cybersecurity practices for such information required Defendants to implement layered safeguards designed both to prevent unauthorized access and to promptly identify and contain an intrusion if an initial security control failed.

123. On information and belief, Defendants failed to implement and/or adequately maintain reasonable security practices consistent with these standards, including one or more failures relating to access controls, authentication, network monitoring, intrusion detection, vulnerability management, security configuration, segmentation, protection of sensitive stored data, incident detection, and incident response.

124. These failures permitted an unauthorized third party to access Baylor Genetics' network and data maintained within it between approximately June 11 and June 17, 2026.

125. The precise security deficiencies exploited during the Data Breach, the controls Defendants had or had not implemented before the intrusion, and the extent to which Natera imposed and monitored cybersecurity requirements applicable to Baylor Genetics are facts principally or exclusively within Defendants' possession and control.

**I. Defendants Breached Their Duties to Safeguard Plaintiff's and Class Members' Private Information**

126. By choosing to collect, receive, process, transmit, use, and retain Plaintiff's and Class members' Private Information, Defendants owed duties to exercise reasonable care in safeguarding that information from unauthorized access, acquisition, disclosure, and misuse.

127. Those duties arose from, among other things, Defendants' collection and possession of the information; the sensitive and confidential nature of the information; the foreseeable risk that cybercriminals would target genetic and healthcare data; Defendants' superior ability to protect information maintained within their systems and commercial relationships; applicable healthcare privacy and security requirements; industry standards; and Defendants' representations and undertakings concerning the confidentiality and security of patient information.

128. Defendants' duties included, but were not limited to:

a. exercising reasonable care in obtaining, retaining, securing, safeguarding, transmitting, deleting, and protecting Private Information;

b. maintaining reasonable and adequate security procedures and systems consistent with accepted industry standards and the sensitivity of genetic and medical information;

c. implementing procedures designed to prevent unauthorized access to, acquisition of, and disclosure of Private Information;

d. implementing appropriate access controls, authentication, network monitoring, intrusion detection, vulnerability management, and incident-response procedures;

e. timely identifying and responding to security incidents and acting upon warnings or indications of unauthorized activity;

f. retaining Private Information only for so long as reasonably necessary and securely disposing of information no longer required;

g. appropriately selecting, contracting with, and overseeing third parties to which Private Information was entrusted;

h. requiring third parties receiving Private Information to employ reasonable and appropriate security safeguards;

i. promptly notifying affected individuals following a compromise and accurately disclosing the nature and categories of information affected; and

j. otherwise exercising reasonable care commensurate with the extraordinary sensitivity and foreseeable consequences of compromise of genetic and medical information.

129. Natera owed additional duties arising from its position as the patient-facing provider of Plaintiff's Empower genetic testing. Plaintiff entrusted her Private Information to Natera in connection with a Natera-branded, physician-ordered medical test. Natera was therefore obligated to exercise reasonable care in determining which entities would receive that information and in ensuring that entities participating in the testing process maintained reasonable safeguards.

130. Baylor Genetics owed corresponding duties because it obtained and maintained Plaintiff's Private Information despite having no direct or known relationship with Plaintiff. Having accepted possession of highly sensitive patient information through its commercial relationship with

Natera, Baylor Genetics was obligated to protect that information against unauthorized access and disclosure.

131. Defendants breached these duties by failing to implement and maintain reasonable safeguards sufficient to protect Plaintiff's and Class members' Private Information.

132. Upon information and belief, Defendants' acts and omissions included one or more of the following:

a. failing to maintain an adequate data-security program appropriate to the sensitivity of the information entrusted to them;

b. failing to adequately protect Private Information against reasonably foreseeable cyberattacks;

c. failing to implement adequate access controls and authentication safeguards;

d. failing to adequately monitor systems and networks for unauthorized access and suspicious activity;

e. failing to timely identify, contain, and remediate unauthorized access;

f. failing to appropriately identify and remediate security vulnerabilities;

g. failing to adequately minimize, segment, encrypt, and/or otherwise protect sensitive information maintained within affected systems;

h. failing to maintain adequate policies, procedures, training, and controls governing access to Private Information;

i. failing to adhere to applicable healthcare data-security requirements and accepted cybersecurity standards;

j. failing to appropriately oversee and ensure reasonable security by entities participating in Defendants' genetic-testing operations; and

k. otherwise failing to exercise reasonable care to protect Plaintiff's and Class members' Private Information.

133. Defendants knew or should have known that these failures created an unreasonable and foreseeable risk that unauthorized persons would gain access to patients' Private Information.

134. Had Defendants implemented and maintained reasonable safeguards appropriate to

the sensitivity of the information they collected and maintained, the Data Breach would have been prevented or its scope and duration substantially reduced.

135. As a direct and foreseeable result of Defendants' failures, Plaintiff's and Class members' Private Information was exposed to unauthorized access and Plaintiff and Class members suffered the injuries alleged below.

**J. Defendants' Security Failures Were Particularly Unreasonable Given the Nature of the Data**

136. Defendants' conduct must be evaluated in light of the information they chose to collect and retain. An entity maintaining hereditary-cancer genetic information cannot reasonably employ the same security precautions appropriate to ordinary commercial information.

137. Defendants knew that the compromise of genetic information could not be remedied by issuing a replacement account number, password, or payment card. The biological information encoded in a patient's DNA is permanent.

138. Defendants further knew that hereditary-cancer information may reveal deeply personal information concerning an individual's present and future health risks and may indirectly reveal information concerning biological relatives.

139. Defendants nevertheless maintained Plaintiff's and Class members' Private Information in systems that an unauthorized third party was able to access.

140. Baylor Genetics' post-breach decision to strengthen monitoring, identity and access management, and other security controls further demonstrates that additional safeguards capable of reducing the risk of unauthorized access were available.

141. Defendants' failure to employ security measures commensurate with these risks was unreasonable and fell below the standard of care applicable to sophisticated entities engaged in commercial genetic testing.

**K. Plaintiff Jessica White's Experience**

142. Plaintiff Jessica White is a resident and citizen of Texas. In 2025, Plaintiff was receiving medical care through UTMB Regional Women's Services and Pediatrics.

143. Because Plaintiff was considered at heightened risk for breast cancer, her healthcare

provider ordered hereditary-cancer genetic testing to obtain information relevant to Plaintiff's cancer risk and medical care.

144. Plaintiff did not independently seek out genetic testing as a consumer product. The testing was ordered by her healthcare provider for a medical purpose.

145. Plaintiff's ordering provider was Karen Lazard of UTMB Regional Women's Services and Pediatrics. In connection with the physician-ordered testing, Plaintiff was directed to Natera and underwent Natera's Empower Hereditary Cancer Test.

146. Empower is specifically designed to identify genetic changes associated with hereditary cancer syndromes. Natera explains that the test examines genetic changes in a patient's DNA and that the resulting information, together with the patient's cancer history, may be used by healthcare providers to guide treatment decisions.

147. As part of the testing process, Plaintiff was required to establish an account with Natera. On or about April 29, 2025, Natera confirmed the creation of Plaintiff's account and directed her to Natera's Patient Portal, through which she could obtain information concerning her test, track its status, and access her results.

148. Natera thereby presented itself to Plaintiff as the entity providing and administering her genetic-testing services. Plaintiff dealt with Natera—not Baylor Genetics—in connection with the testing.

149. Natera assigned Plaintiff Case/Kit No. 16529873 in connection with her genetic testing and maintained information identifying Plaintiff, her ordering healthcare provider and clinic, and her genetic test.

150. Plaintiff's Empower testing was completed in approximately May 2025, and her results were made available through Natera's Patient Portal.

151. When Plaintiff experienced difficulty accessing her genetic-testing results, she communicated directly with Natera for assistance. Her results were medically important: Plaintiff explained during those communications that her healthcare provider needed the results in connection with determining her course of care.

152. In order for Natera to locate and assist with Plaintiff's testing records, Plaintiff

provided Natera with information including her identity, ordering healthcare provider, ordering clinic, Natera case or kit information, and other identifying information associated with her testing.

153. Throughout this process, Plaintiff reasonably understood that she was receiving a Natera genetic test. The test was branded Empower; Plaintiff's account was maintained by Natera; Plaintiff communicated with Natera concerning her results; and Natera controlled the patient portal through which those results were provided.

154. Plaintiff did **not** select Baylor Genetics to perform any part of her testing. Before receiving the Data Breach notice described below, Plaintiff had never heard of Baylor Genetics.

155. Plaintiff did not knowingly create an account with Baylor Genetics, communicate with Baylor Genetics concerning her testing, authorize Baylor Genetics to maintain her genetic information, or otherwise knowingly establish a relationship with Baylor Genetics.

156. Plaintiff likewise was not aware that Baylor Genetics possessed, processed, stored, or otherwise had access to information concerning her physician-ordered Natera Empower test.

157. Nevertheless, approximately one year after Plaintiff underwent the Natera testing, Baylor Genetics experienced the Data Breach alleged herein.

158. Baylor Genetics subsequently sent Plaintiff an individualized written notice concerning the Data Breach.

159. The receipt of that notice was the first time Plaintiff learned that Baylor Genetics possessed information concerning her.

160. Baylor Genetics informed Plaintiff that an unauthorized third party had accessed portions of Baylor Genetics' network and data stored on that network between approximately June 11 and June 17, 2026.

161. Baylor Genetics further informed Plaintiff that its investigation determined that information relating to her may have been contained within the impacted data and that the information potentially involved for Plaintiff included her name together with one or more of the following: date of birth, medical testing information, laboratory test results, and potentially health-insurance information.

162. Given Plaintiff's receipt of an individualized notice from Baylor Genetics, Plaintiff

reasonably believes that Baylor Genetics possessed Private Information identifiable to her and that information concerning her was maintained within the data population implicated by Baylor Genetics' investigation.

163. Plaintiff had provided genetic and medical information to Natera for one specific and exceptionally sensitive purpose: physician-ordered hereditary-cancer testing prompted by her heightened breast-cancer risk. She reasonably expected that information to be maintained confidentially and protected using security safeguards appropriate to its nature.

164. Plaintiff would not knowingly have entrusted her genetic and medical information to an entity that failed to maintain reasonable safeguards against unauthorized access, nor would she knowingly have permitted her genetic information to be transmitted to and retained by an undisclosed participant in the testing process without reasonable protections.

165. Only after Baylor Genetics notified Plaintiff of the Data Breach did Plaintiff learn that a company she had never heard of possessed information concerning her medical or genetic testing and had exposed that information to unauthorized access.

166. Plaintiff remains unaware of precisely what information Natera transmitted or made available to Baylor Genetics; why Baylor Genetics continued to possess that information at the time of the Data Breach; what systems contained it; how long Baylor Genetics retained it; whether Baylor Genetics possessed Plaintiff's underlying genetic data, test results, medical-testing information, family medical history, or other associated information; and what security requirements Natera imposed upon Baylor Genetics.

167. These facts are exclusively or principally within Defendants' possession and control.

168. Plaintiff reasonably believes, based upon her physician-ordered Natera Empower testing, the documented relationship between Natera and Baylor Genetics concerning Empower and other genetic-testing services, and Baylor Genetics' individualized notice to Plaintiff, that her Private Information came into Baylor Genetics' possession in connection with Defendants' genetic-testing relationship.

169. As a direct and proximate result of Defendants' conduct and the Data Breach, Plaintiff suffered an invasion of her privacy and a loss of the confidentiality and control of highly sensitive

medical and genetic information that she entrusted to Natera for medical purposes and that subsequently came into Baylor Genetics' possession.

170. Baylor Genetics specifically identified Plaintiff as an individual whose information was implicated by the Data Breach and provided her an individualized notice concerning the incident. Plaintiff had never heard of Baylor Genetics and did not know before receiving that notice that Baylor Genetics possessed information concerning her genetic testing.

171. The compromise of Plaintiff's information deprived her of the ability to control who possesses and has access to information concerning her medical care and genetic testing. Unlike a payment-card number or password, genetic and medical information cannot simply be cancelled, reset, or replaced.

172. Plaintiff also faces a continuing risk that information compromised in the Data Breach may be further disseminated or misused. That risk is especially consequential because information generated through hereditary-cancer testing is permanent, intensely personal, and potentially revealing of both Plaintiff's health and the hereditary characteristics of her biological relatives.

173. Plaintiff therefore has a concrete and continuing interest in ensuring that Private Information remaining in Defendants' possession is protected against further unauthorized access or disclosure.

**L. Plaintiff and Class Members Have Suffered and Will Continue to Suffer Harm**

174. As a direct and proximate result of Defendants' acts and omissions, Plaintiff and Class members have suffered and will continue to suffer injury from the compromise of their Private Information.

175. These injuries include the loss of privacy and confidentiality associated with highly sensitive information entrusted for medical purposes; the loss of control over that information; and the continuing risk that compromised medical and genetic information may be further disseminated or misused.

176. These harms are particularly acute because the Private Information maintained in connection with Defendants' genetic-testing operations includes information that cannot meaningfully be changed or replaced.

177. A compromised payment card can be cancelled. A compromised password can be reset. An individual cannot change her DNA, hereditary characteristics, genetic variants, or personal and family medical history after that information has been exposed.

178. Nor does the sensitivity of genetic information end with the person tested. Hereditary genetic information may reveal information concerning biological relatives who share portions of the same genetic inheritance.

179. Plaintiff and Class members therefore face privacy and security risks that are qualitatively different from those resulting from the compromise of ordinary commercial information.

180. The injuries arising from the Data Breach are also continuing. Once highly sensitive Private Information has been compromised and placed at risk of unauthorized access or acquisition, the affected individual cannot control whether that information will thereafter be retained, disseminated, aggregated with other data, or misused.

181. Cybercriminals can combine compromised medical and identifying information with information obtained from other sources to construct increasingly complete profiles of individual victims and use those profiles to commit targeted fraud and identity theft.

182. Private medical information is itself valuable to criminals. It may be used to commit medical identity theft, obtain medical services or insurance benefits in another person's name, facilitate targeted fraud and social engineering, and supplement other stolen information used for broader identity theft.

183. Plaintiff and Class members also have a continuing interest in ensuring that Private Information remaining in Defendants' possession is protected through reasonable and appropriate security measures.

184. That interest is particularly acute because Defendants continue to operate genetic-testing businesses that require the collection and retention of sensitive patient information and because Baylor Genetics' systems have already demonstrated susceptibility to unauthorized access.

185. Monetary damages alone therefore cannot fully remedy the harms caused by Defendants' conduct. Plaintiff and Class members also seek appropriate injunctive and equitable relief requiring Defendants to implement and maintain reasonable safeguards designed to protect the Private

Information they continue to possess.

## V. CLASS ACTION ALLEGATIONS

186. Plaintiff brings this action individually and on behalf of all similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

187. Subject to further investigation and discovery, Plaintiff proposes the following nationwide Class:

> **All persons in the United States whose Private Information was provided or made available to Baylor Genetics in connection with genetic-testing or related services involving Natera and was accessed, acquired, compromised, disclosed, and/or otherwise affected as a result of the Baylor Genetics Data Breach announced in 2026 (The "Class").**

188. In the alternative, and to the extent necessary following choice-of-law analysis and discovery, Plaintiff reserves the right to seek certification of appropriate state subclasses, including subclasses consisting of residents of Texas and/or California.

189. Excluded from the Class are Defendants; their parents, subsidiaries, affiliates, officers, directors, and employees; all persons who timely and validly request exclusion from any class certified by the Court; the judicial officers assigned to this case and members of their immediate families; and any other persons whose exclusion the Court deems appropriate.

190. Plaintiff reserves the right to amend or refine the proposed class definitions based upon discovery and further investigation.

### 1. Numerosity

191. The members of the proposed Class are so numerous that joinder of all members is impracticable.

192. Baylor Genetics has acknowledged that the Data Breach implicated patient information and sent notices to affected individuals, including Plaintiff. The exact number and identities of Class members are known to Defendants and can be determined from their records.

193. Class members are readily ascertainable through Defendants' records, including the records used to identify and notify individuals affected by the Data Breach.

### 2. Commonality

194. There are numerous questions of law and fact common to Plaintiff and Class members, including:

a. whether Defendants owed duties to safeguard Class members' Private Information;

b. whether Defendants employed reasonable administrative, technical, and physical safeguards;

c. whether Defendants complied with applicable healthcare privacy and security standards;

d. whether Defendants complied with generally accepted cybersecurity practices;

e. whether Defendants adequately monitored their systems and networks for unauthorized access;

f. whether Baylor Genetics failed to timely detect, contain, or remediate the intrusion;

g. whether Natera exercised reasonable care in selecting, contracting with, and overseeing Baylor Genetics and other entities to which it entrusted patients' Private Information;

h. whether Natera required Baylor Genetics to employ reasonable and appropriate cybersecurity safeguards;

i. what Private Information was accessed, acquired, viewed, copied, exfiltrated, and/or otherwise compromised;

j. whether Defendants retained Private Information longer than reasonably necessary;

k. whether Defendants provided adequate and timely notice of the Data Breach;

l. whether Defendants' conduct caused Plaintiff and Class members injury;

m. whether Plaintiff and Class members are entitled to damages, restitution, declaratory relief, and/or injunctive relief; and

n. whether Defendants should be required to implement additional security measures to protect Private Information remaining in their possession.

**3. Typicality**

195. Plaintiff's claims are typical of the claims of Class members because Plaintiff's Private Information was maintained within the same genetic-testing and data-management environment implicated by the conduct alleged herein, and Plaintiff's claims arise from the same course of conduct by Defendants.

196. Plaintiff and Class members were subject to substantially similar data-security practices and suffered the same core injury: the compromise and loss of control of Private Information that Defendants were obligated to protect.

197. Plaintiff advances the same legal theories on behalf of herself and Class members, and no defense unique to Plaintiff defeats typicality.

**4. Adequacy**

198. Plaintiff will fairly and adequately protect the interests of Class members.

199. Plaintiff's interests are aligned with those of the Class, and Plaintiff has no interests antagonistic to or in conflict with the interests of absent Class members.

200. Plaintiff has retained counsel experienced in complex litigation, consumer class actions, privacy litigation, and data-breach litigation and is prepared to vigorously prosecute this action on behalf of the Class.

**5. Predominance**

201. Common questions of law and fact predominate over any questions affecting only individual Class members.

202. The central issues concern Defendants' uniform conduct, including the security practices employed to protect Private Information, the circumstances of the Data Breach, the nature of Defendants' genetic-testing relationship, the safeguards imposed upon the transmission and retention of patient information, and Defendants' response to the breach.

203. These questions can be resolved through common evidence, including Defendants' cybersecurity policies and practices, contracts and agreements, system architecture, security assessments, incident-response materials, breach-investigation records, data-retention policies, and records identifying affected individuals.

**6. Superiority**

204. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

205. The damages suffered by many individual Class members may be insufficient to justify the cost of individual litigation, particularly where the evidence necessary to establish Defendants'

security failures and data-sharing practices is predominantly in Defendants' possession.

206. Requiring Class members to pursue separate actions would risk inconsistent adjudications concerning Defendants' duties, cybersecurity practices, and responsibility for the Data Breach and would unnecessarily duplicate judicial and party resources.

207. Class treatment will permit these common questions to be resolved efficiently and consistently in a single proceeding.

**7. Rule 23(b)(2)**

208. Defendants have acted or refused to act on grounds generally applicable to the Class, making final injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole.

209. Defendants continue to maintain Private Information belonging to Plaintiff and Class members, and Plaintiff seeks relief requiring Defendants to implement reasonable and appropriate measures designed to protect that information against future unauthorized access.

**8. Ascertainability**

210. The members of the proposed Class are objectively ascertainable from Defendants' records.

211. Baylor Genetics identified individuals whose information was potentially implicated by the Data Breach and sent breach notices to those persons. Natera and Baylor Genetics likewise maintain records identifying the patients, tests, specimens, data, and transactions associated with their genetic-testing relationship.

212. Those records will permit Class membership to be determined without individualized fact-finding.

## VI. CLAIMS FOR RELIEF

### <u>COUNT I</u>
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class Against All Defendants)

213. Plaintiff repeats and realleges the allegations above as though fully set forth herein.

214. Defendants knowingly collected, received, obtained, processed, transmitted, maintained, and/or stored Plaintiff's and Class members' Private Information in connection with their

genetic-testing businesses and services.

215. Defendants knew or should have known that the Private Information entrusted to them was highly sensitive and confidential and included PII and PHI relating to medical testing, laboratory results, and, as applicable, genetic testing and hereditary disease risk.

216. By collecting and maintaining Plaintiff's and Class members' Private Information, Defendants assumed and owed duties to exercise reasonable care in safeguarding that information against unauthorized access, acquisition, disclosure, loss, theft, and misuse.

217. Defendants' duties arose independently of any contractual obligations and included duties imposed by common law, applicable statutes and regulations, industry standards, Defendants' undertakings concerning patient privacy and data security, and the foreseeable risk created by collecting and maintaining highly sensitive medical and genetic information.

218. Defendants knew or should have known that healthcare and genetic-testing companies are attractive targets for cybercriminals and that unauthorized access to genetic and medical information could cause substantial and lasting harm.

219. The risk was particularly foreseeable because Defendants chose to collect and maintain information that cannot simply be changed following a compromise, including medical histories, laboratory-testing information, and genetic information reflecting immutable biological characteristics.

220. Defendants were in the best position to protect the Private Information entrusted to them. Plaintiff and Class members had no ability to control Defendants' computer systems, cybersecurity practices, data-retention practices, vendor relationships, access controls, or the manner in which Defendants transmitted and maintained Private Information within their genetic-testing operations.

221. Baylor Genetics owed Plaintiff and Class members a duty to implement and maintain reasonable administrative, technical, and physical safeguards appropriate to the nature and sensitivity of the Private Information it possessed.

222. Baylor Genetics' duties included, among other things, maintaining reasonable cybersecurity systems and practices; restricting and authenticating access to sensitive information;

monitoring its systems for unauthorized activity; identifying and remediating vulnerabilities; timely detecting and containing security incidents; and protecting Private Information from unauthorized access, acquisition, and disclosure.

223. Natera likewise owed Plaintiff and Class members duties arising from its collection and use of their Private Information and from its role in the genetic-testing process through which their information came into Baylor Genetics' possession.

224. Having collected Plaintiff's Private Information through its Natera-branded Empower genetic-testing service and, upon information and belief, disclosed, transmitted, made available, and/or caused that information to be provided to Baylor Genetics, Natera had a duty to exercise reasonable care in safeguarding that information throughout the testing process.

225. Natera's duty included exercising reasonable care in selecting and retaining entities to which it entrusted patients' Private Information; reasonably evaluating their ability to safeguard that information; imposing appropriate contractual and technical security requirements; limiting the information disclosed and retained to that reasonably necessary for the services performed; and reasonably monitoring compliance with applicable data-security requirements.

226. The foreseeability of harm from inadequate third-party security was well established. The FTC has specifically advised companies handling sensitive information to verify that third-party service providers implement reasonable security measures.

227. Defendants breached their duties by failing to exercise reasonable care in safeguarding Plaintiff's and Class members' Private Information.

228. Baylor Genetics' breaches include, upon information and belief:

a. failing to maintain reasonable and appropriate cybersecurity safeguards;

b. failing to adequately protect systems containing Private Information against unauthorized access;

c. failing to implement adequate access controls, authentication, network monitoring, intrusion detection, segmentation, vulnerability management, and other appropriate safeguards;

d. failing to timely detect and contain unauthorized access to its network;

e. permitting an unauthorized third party to access portions of its network and data maintained

therein for approximately one week;

f. failing to adequately protect, minimize, segregate, encrypt, and/or otherwise secure sensitive patient information;

g. retaining Private Information without adequate safeguards and/or longer than reasonably necessary;

h. failing to comply with reasonable healthcare and genetic-data security practices; and

i. otherwise failing to exercise reasonable care under the circumstances.

229. Natera's breaches include, upon information and belief:

a. failing to exercise reasonable care in entrusting Plaintiff's and Class members' Private Information to Baylor Genetics;

b. failing to ensure that Baylor Genetics maintained security safeguards commensurate with the sensitivity of the genetic and medical information entrusted to it;

c. failing to adequately assess and monitor Baylor Genetics' cybersecurity practices;

d. failing to impose and/or enforce adequate security requirements governing Baylor Genetics' possession and retention of patient information;

e. failing to reasonably minimize the Private Information made available to Baylor Genetics and/or the period for which such information was retained;

f. failing to adequately protect Plaintiff's and Class members' Private Information throughout Defendants' genetic-testing relationship; and

g. otherwise failing to exercise reasonable care under the circumstances.

230. The precise nature of Natera's cybersecurity requirements for Baylor Genetics, its diligence concerning Baylor Genetics' security, the parties' contractual allocation of data-security responsibilities, their data-retention requirements, and their compliance with those requirements are matters principally or exclusively within Defendants' possession and control.

231. Defendants' breaches of their duties were the actual and proximate cause of the Data Breach and the resulting compromise of Plaintiff's and Class members' Private Information.

232. The injuries suffered by Plaintiff and Class members were a reasonably foreseeable consequence of Defendants' failure to adequately safeguard highly sensitive information against

unauthorized access.

233. As a direct and proximate result of Defendants' negligence, Plaintiff and Class members have suffered and continue to suffer injuries including loss of privacy and confidentiality, loss of control over their Private Information, and exposure to an increased and continuing risk of further dissemination and misuse of highly sensitive medical and genetic information.

234. Plaintiff and Class members are entitled to recover compensatory damages and all other relief permitted by law.

**COUNT II**
**(BREACH OF IMPLIED CONTRACT)**
**(On Behalf of Plaintiff and the Class Against Natera)**

235. Plaintiff repeats and realleges the allegations above as though fully set forth herein.

236. Plaintiff and Class members provided their Private Information to Natera in connection with Natera's provision and administration of genetic-testing services.

237. Natera solicited, accepted, collected, received, processed, used, and/or retained Plaintiff's and Class members' Private Information as an integral part of providing those services and conducting its commercial genetic-testing business.

238. Plaintiff's physician ordered Natera's Empower hereditary-cancer test for Plaintiff because of her heightened risk for breast cancer. In connection with that testing, Plaintiff established a Natera account, provided Natera information necessary to identify and administer her test, and used Natera's Patient Portal to obtain information concerning her testing and results.

239. Plaintiff thereby entered into an implied contract with Natera under which Natera agreed to provide genetic-testing services and Plaintiff agreed to provide the information necessary for Natera to perform and administer those services.

240. An implicit and material term of that agreement was that Natera would maintain the confidentiality of Plaintiff's Private Information and employ reasonable measures to safeguard it against unauthorized access and disclosure.

241. This term was inherent in the nature of the transaction. Plaintiff was not purchasing an ordinary commercial service. She was obtaining physician-ordered hereditary-cancer testing that required her to entrust Natera with highly sensitive medical information and information derived from

her DNA.

242. Plaintiff reasonably understood and expected that Natera would use her Private Information only as reasonably necessary to provide the genetic-testing services for which it was collected and would take reasonable steps to protect that information, including when transmitting or entrusting it to entities participating in the testing process.

243. Natera accepted Plaintiff's Private Information and the economic benefits associated with providing Plaintiff's genetic-testing services with knowledge that Plaintiff reasonably expected her information to remain confidential and secure.

244. Plaintiff and Class members performed their obligations under their implied agreements with Natera by, among other things, providing the information necessary to obtain genetic-testing services and providing consideration, directly and/or through payments made on their behalf by insurers or other third-party payors.

245. Natera breached its implied contractual obligations by failing to employ reasonable measures to safeguard Plaintiff's and Class members' Private Information and by failing to exercise reasonable care to ensure that Private Information made available to entities participating in Natera's genetic-testing services was reasonably protected.

246. Had Plaintiff known that Natera would not adequately protect her Private Information, including information made available to entities participating in Natera's genetic-testing services, she would not have provided her information to Natera on the same terms.

247. As a direct and proximate result of Natera's breaches, Plaintiff and Class members suffered the injuries alleged herein, including loss of privacy and confidentiality and loss of control over their Private Information.

248. Plaintiff and Class members are entitled to recover damages and all other relief available for Natera's breach of its implied contractual obligations.

## **COUNT III**
## **UNJUST ENRICHMENT**
## **(On Behalf of Plaintiff and the Class Against All Defendants)**

249. Plaintiff repeats and realleges the allegations above as though fully set forth herein.

250. Plaintiff and Class members conferred benefits upon Defendants by providing

valuable Private Information and by paying, directly or through insurers and other third-party payors, for genetic-testing and related laboratory services.

251. Defendants knowingly accepted and retained those benefits.

252. Defendants derived economic value from Plaintiff's and Class members' Private Information because the collection, processing, analysis, and maintenance of patient information was essential to the genetic-testing services Defendants commercially offered and performed.

253. A portion of the payments received by Defendants was attributable to the reasonable costs of maintaining the privacy and security of the sensitive information necessarily collected and generated in providing those services.

254. Plaintiff and Class members reasonably expected that Defendants would devote sufficient resources to protecting their Private Information and would employ data-security measures commensurate with the sensitivity of medical and genetic information.

255. Defendants nevertheless retained the benefits conferred upon them while failing to provide the reasonable data security that formed part of the value of the services for which Plaintiff and Class members paid.

256. Defendants were thereby enriched at Plaintiff's and Class members' expense by retaining monies and other benefits that should have been used to provide reasonable security for their Private Information.

257. It would be unjust and inequitable for Defendants to retain those benefits without compensating Plaintiff and Class members for the deficiencies in the privacy and data security accompanying Defendants' services.

258. Plaintiff and Class members therefore seek restitution, disgorgement, and other equitable relief necessary to prevent Defendants' unjust enrichment.

## COUNT IV
## VIOLATION OF THE CONFIDENTIALITY OF MEDICAL INFORMATION ACT
## Cal. Civ. Code §§ 56.101, 56.36
## (On Behalf of Plaintiff and the Class Against Natera)

259. Plaintiff incorporates by reference the preceding allegations as though fully set forth herein.

260. Natera is a "provider of health care" within the meaning of the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56.05, because, among other things, it operates a licensed clinical laboratory in California and provides clinical genetic-testing services.

261. Plaintiff's genetic-testing information constitutes "medical information" within the meaning of Cal. Civ. Code § 56.05 because it concerns Plaintiff's medical history, condition, and genetic testing and was maintained in connection with healthcare services provided to Plaintiff.

262. Cal. Civ. Code § 56.101(a) requires a provider of health care that creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information to do so in a manner that preserves the confidentiality of that information.

263. Natera created, received, maintained, processed, and handled Plaintiff's medical information in California in connection with her Empower hereditary-cancer testing. Plaintiff's laboratory report identifies her Natera case-file and collection-kit numbers, ordering physician and clinic, blood sample, and genetic-testing results. The report further states that the pre-analytic phase of Plaintiff's test was performed by Natera at its San Carlos, California laboratory.

264. Plaintiff's laboratory report further states that Baylor Genetics performed Plaintiff's genetic test at its Houston laboratory and that the post-analytic phase was performed by NSTX, Inc. in Austin, Texas. The report identifies laboratory directors for both Baylor Genetics and Natera.

265. Natera was required to exercise reasonable care in creating, maintaining, processing, handling, and transmitting Plaintiff's medical information throughout the genetic-testing process, including in connection with the transfer of Plaintiff's medical information for performance of her Empower test.

266. Natera violated § 56.101(a) by negligently creating, maintaining, processing, handling, and/or transmitting Plaintiff's and Class members' medical information in a manner that failed to preserve its confidentiality and exposed that information to a significant risk of unauthorized access or use.

267. Plaintiff's medical information was thereafter maintained by Baylor Genetics and implicated in the Data Breach alleged herein, in which an unauthorized third party gained access to Baylor Genetics' network and data maintained there.

268. As a result of Natera's violation of the CMIA, Plaintiff and Class members are entitled to the relief provided by Cal. Civ. Code § 56.36, including nominal damages under § 56.36(b)(1), actual damages where established, and all other relief permitted by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jessica White, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in her favor and against Defendants and award the following relief:

A. An Order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiff as Class Representative, and appointing her counsel as Class Counsel;

B. An award of actual, compensatory, consequential, statutory, and nominal damages in amounts to be determined at trial;

C. Restitution, disgorgement, and other equitable monetary relief to the extent permitted by law;

D. Appropriate declaratory and injunctive relief requiring Defendants to implement and maintain reasonable measures to protect Plaintiff's and Class members' Private Information;

E. Pre-judgment and post-judgment interest as provided by law;

F. Reasonable attorneys' fees, litigation expenses, and costs to the extent permitted by law; and

G. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

Date: August 27, 2026

*/s/ Sabita J. Soneji*

Sabita Soneji (CA Bar No. 224262)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
(510) 254-6808

*Attorneys for Plaintiff and the Proposed Class.*